JOSEPH & HERZFELD LLP
D. Maimon Kirschenbaum (DK-2338)
Charles E. Joseph (CJ-9442)
Michael D. Palmer (MP-5090)
757 Third Avenue, 25th Floor
New York, New York 10017
Telephone:  (212) 688-5640
Facsimile:  (212) 688-2548\

LAW OFFICES OF JEFFREY E. GOLDMAN
Jeffrey E. Goldman (JG-4693)
501 Fifth Avenue, Suite 1900
New York, New York 10017
Telephone:  (212) 983-8999
Facsimile: (215) 732-2496


*Attorneys for Plaintiffs Alisa Agofonova*
*and Aaron Pou, on behalf of themselves*
*and all others similarly situated*

United States District Court
Southern District of New York

_____

| | |
|---|---|
| ALISA AGOFONOVA and AARON POU on behalf of themselves and all others similarly situated, ) ) ) | |
| ) | Index No: 07 CIV 6926 (DAB) |
| Plaintiff , ) ) | |
| v. ) ) | **JUDGE: HON. DEBORAH A. BATTS** |
| NOBU CORP., NOBU ASSOCIATES, L.P., NOBU NEXT DOOR, LLC, NOBU 57 LLC, DREW NIEPORENT, and RICHARD NOTAR, ) ) ) | |
| Defendants. ) ) ) ) | |

_____

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    BACKGROUND ...................................................................................................2

    A.    Plaintiffs' Allegations ...............................................................................2

    B.    Defendants' Assertions .............................................................................3

    C.    Discovery..................................................................................................4

    D.    Mediation..................................................................................................4

    E.    Settlement Terms ......................................................................................5

    F.    Factors Considered In The Settlement Of The Claims .............................7

        1.    Sushi Chefs .....................................................................................8

        2.    Other Considerations ......................................................................8

        3.    Conclusion ......................................................................................9

    G.    Class Members' Response To Settlement..................................................9

III.    ARGUMENT .......................................................................................................10

    A.    The Proposed Settlement Should Be Approved .....................................10

        1.    The Proposed Settlement Class Satisfies The Requirements Of Rule 23 ..........................................................................................10

            a.    Plaintiffs Have Met All Of The Prerequisites Under Rule 23(a) .......................................................................11

                1)    Numerosity Is Satisfied ................................................11

                2)    Commonality Is Satisfied .............................................11

                3)    Typicality Is Satisfied...................................................12

                4)    Adequacy Is Satisfied ...................................................12

            b.    The Court Should Certify The Settlement Class Under Rule 23(b)(3) ...................................................................12

        2.    The Proposed Settlement Is Fair, Reasonable, And Adequate And Should Be Approved......................................................13

a.      Procedural Fairness ....................................................................13

b.      Substantive Fairness ...................................................................14

    1)      The Complexity, Expense And Likely Duration Of The Litigation .................................................................14

    2)      The Reaction Of The Class To The Settlement ...............15

    3)      The Stage Of The Proceedings And The Amount Of Discovery Completed .........................................................16

    4)      The Risks Of Establishing Liability ................................16

    5)      The Risks Of Establishing Damages ...............................16

    6)      The Risks Of Maintaining The Class Action Through The Trial ........................................................................17

    7)      The Ability Of The Defendants To Withstand A Greater Judgment .............................................................18

    8)      The Range Of Reasonableness Of The Settlement Fund In Light Of The Best Possible Recovery And The Attendant Risks Of Litigation ....................................18

3.      The Notice to Class Members Meets the Requirements of Rule 23 .........19

4.      Incentive Payments Should Be Awarded To The Named Class Representatives And Select Opt-in Class Members................................20

5.      Class Counsel's Attorneys Fees Should be Approved..............................22

a.      Class Counsel's Requested Fee Award Is Reasonable.................24

b.      The *Goldberger* Factors ............................................................26

    1)      Counsel's Time And Labor..............................................26

    2)      The Litigation's Magnitude And Complexity..................27

    3)      The Risks Of Litigation ..................................................27

    4)      Quality Of The Representation .......................................29

    5)      The Fee Is Reasonable In Relation To The Settlement .....30

    6)      Public Policy Considerations ..........................................30

IV.      CONCLUSION ....................................................................................30

## I.   **INTRODUCTION**

Pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") and Section 216(b) of the Fair Labor Standards Act ("FLSA"), Plaintiffs Alisa Agofonova and Aaron Pou ("Class Representatives") apply to this Court for final approval of a proposed settlement in this wage and hour class and collective action ("Wage Action").  The Wage Action was brought on behalf of service employees of Nobu Corp., Nobu Associates, L.P., Nobu Next Door, LLC, Nobu 57 LLC, Drew Nieporent and Richard Notar ("Defendants.")  The settlement will resolve all claims brought before this Court in the Wage Action pursuant to the proposed compromise set forth in a Joint Stipulation of Settlement and Release, dated August 6, 2008 ("Agreement").[1]

The Settlement Class includes tipped service employees (servers, runners, bussers, bartenders, and similar positions) in two categories. (1) Employees with New York State Wage & Hour Claims:  Current or former employees of Nobu, Nobu 57, or Nobu Next Door who worked at any of the three restaurants from August 2, 2001 through August 6, 2008, excluding employees who opted-out and excluded themselves from the settlement; and (2) Employees with FLSA Claims:  Current or former employees of Nobu, Nobu 57, or Nobu Next Door[2] who worked at any of the three restaurants from July 1, 2005 through August 6, 2008 and who opted-in to the FLSA Class (pursuant to 29 U.S.C. § 216(b)).[3]

On October 1, 2008, the Court preliminarily approved the proposed settlement as being fair, just, reasonable and in the best interests of the Settlement Class.  In so approving, the Court preliminarily certified the Settlement Class and found that for purposes of the settlement the State Settlement Class (*i.e.* Category 1) met the requirements for class certification under the Federal Rules of Civil Procedure and that the FLSA collective action (*i.e.* Category 2) was similarly situated (pursuant to 29 U.S.C. § 216(b)).  The Court also found that the Settlement

---

[1]  For the Courts' convenience, Plaintiffs have attached the Agreement to the Declaration of Maimon Kirschenbaum ("Kirshenbaum Decl."), Exhibit A.

[2]  Hereafter, the restaurants Nobu, Nobu 57, and Nobu Next Door are collectively referred to as "Nobu."

[3]  It should be noted that the state settlement class contains employees with FLSA claims (*i.e.* tipped employees who worked at Nobu, Nobu 57, or Nobu Next Door from July 1, 2005 through August 6, 2008.)

Notice proposed in the Agreement constituted valid, due and sufficient notice to the Class members.

Pursuant to the October 1, 2008 Court Order, the Class Counsel mailed and distributed the Settlement Notice and Claims Forms.  *See* Kirschenbaum Decl. ¶14.[4]  Class members had 60 days after the mailing of the Notice and Claims Forms to opt-out of the state claim class action and to object to the terms of the settlement Agreement.  Additionally, FLSA Class members (Category 2) had 60 days to opt-in to the FLSA collective action by submitting a Consent to Join Form.[5]

## II.   BACKGROUND

The Class Representatives filed this Wage Action on August 2, 2007, alleging wage and hour violations under the FLSA and New York's Labor Laws.

### A.   Plaintiffs' Allegations.

The Wage Action alleges that the Defendants violated the federal Fair Labor Standards Act, 29 U.S.C. § 201, *et. seq.,* and New York Labor Law §§ 193, 196-d, 198-b, 650, *et. seq.* and relevant sections of N.Y. Comp. Codes R. & Regs.  Plaintiffs lawsuit asserts that Defendants (1) required service employees to pool their tips and (2) allowed managers, including Floor Captains and Fronts[6], and non-service employees, including sushi chefs, to partake in the tip-pools[7] or otherwise receive a portion of the restaurants' tips.  As a result, Plaintiffs maintain that Defendants wrongfully withheld portions of Plaintiffs' tips in violation of the FLSA and New

---

[4]  Additionally, when a notice was returned as undeliverable, Counsel performed skip traces to find the individual's new address.  A second copy of the notice was then sent to the new address.  *See* Kirschenbaum Decl. ¶15.

[5]  As recognized in Class Counsel's January 13, 2008 endorsed letter to the Court, Class Counsel inadvertently failed to perform skip traces on all notices which were returned by the post office as undeliverable.  Pursuant to the Court's January 14, 2009 order, Class Counsel performed a skip trace and resent a copy of the notice.  These individuals were then given until January 29, 2009 to object to or opt-out of the settlement.  Additionally, those individuals who were employed from July 1, 2005 through August 6, 2008 had until January 29, 2009 to opt-in to the FLSA collective action.

[6]  Floor Captains are supervisory employees in the tip pool at Nobu 57.  "Fronts" are supervisory employees in the tip pool at Nobu Downtown and Nobu Next Door.

[7]  The term "tip-pool" refers to an arrangement in which all tips are collected (or "pooled") and then the pool is divided up among the tipped employees.

York Labor Law.  *See* N.Y. Lab. Law § 196-d ("No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee.").  *See also* 29 U.S.C. §203(m); *Ayres v. 127 Restaurant Corp.*, 12 F. Supp. 2d 305, 308 (S.D.N.Y. 1998) (finding that because Defendant's "manager of the restaurant" "was not an employee 'who customarily and regularly received tips,'" he could not be part of the tip-pool under the FLSA.)

Plaintiffs contend that they were entitled to the return of the tips that had been withheld and redistributed by Nobu to managers and non-service employees.  Further, Plaintiffs argued that by withholding these tips, Defendants had become ineligible for the "tip-credit" and were required to pay service employees the full minimum wage (rather than the lower food service workers' minimum wage.[8])  *See* 29 U.S.C. § 203(m) (tip-credit does not apply where employers retain portions of employees' tips).  Similarly, the service employees were entitled to overtime payments of 1 ½ times full minimum wage for hours worked in excess of forty hours per workweek.

**B.     Defendants' Assertions.**

At all times throughout the Wage Action, Defendants continued to deny any liability or wrongdoing of any kind associated with the claims alleged in the Wage Action.  Defendants further contended, among other things, that they complied with the FLSA and all state wage and hour laws.  Specifically, Defendants maintained that their tip-pools were voluntary and that everyone in their tip-pools was a service employee who was allowed to share in employees' tips.  *See Kilgore v. Outback Steakhouse*, 160 F.3d 294, 301 (6th Cir. 1998) (allowing hosts to share in servers' tips because the hosts provide direct customer service).  Importantly, Defendants strongly maintained that Nobu sushi chefs could participate in the tip-pools.  In addition, Defendants argued that if they returned the allegedly misappropriated tips, they were not

---

[8]  *See* N.Y. Comp. Codes R. & Regs, 12, § 137-1.5 (Tip allowance for food service workers in New York).

required to pay an additional recovery for the tip-credit differential.

**C.**    **Discovery.**

After Defendants appeared in the Wage Action, the Parties met and conferred over both the legal issues and the factual bases underlying the Class Representative's claims. Kirschenbaum Decl. ¶4.

Plaintiffs' served their First Request for Production of Documents on Defendants on December 4, 2007.  Kirschenbaum Decl. ¶5.  On December 5, 2007, Plaintiffs served their First Set of Interrogatories Propounded to Defendants.  *Id.*  Defendants served their First Request for the Production of Documents was served on January 23, 2008.  *Id.*

As part of the discovery process, Defendants produced personnel files of the named plaintiffs and randomly chosen putative Settlement Class members, wage and payroll records, including but not limited to, daily time sheets, ADP reports, daily and weekly payroll worksheets, tip-sheets, and electronic time cards. Kirschenbaum Decl. ¶6 Defendants also produced documents describing each position at their restaurant, including, for example, classified advertisements placed in newspapers and on the internet.  *Id.*  The Parties agreed that these abundant documents were relevant to the claims asserted by the Class Representatives and that the production of these documents facilitated meaningful and productive settlement discussions, including mediation. *Id.* Defendants' Counsel also provided Class Counsel with information obtained from conversations with corporate representatives relating to the case.  *Id.* Class Counsel analyzed all of the records and other information produced by Defendants relating to the putative class.  *Id.* Further, Class Counsel obtained documents from plaintiffs and class members and met extensively with several plaintiffs and class members to review Defendants production and to attain a complete understanding of the case.  *Id.* ¶7.

**D.**    **Mediation.**

The Parties agreed to hold a voluntary mediation ("Mediation") before Ms. Bonnie Siber Weinstock (the "Mediator"), an experienced wage and hour mediator, in an attempt to resolve the issues pending before the Court in this Wage Action.  Kirschenbaum Decl. ¶8.

Prior to the Mediation, the Parties each submitted a confidential Position Statement to the Mediator outlining their position and various defenses.  Kirschenbaum Decl. ¶9.  The Plaintiffs' 138 page position statement contained their legal and factual arguments and cited both legal support and specific Nobu documents in support of their assertions.  *Id.*  The factual assertions of the Parties' Position Statements were based, in-part, upon the documents produced by Defendants prior to the Mediation.  *Id.*  Plaintiffs' Position Statement also included spreadsheets containing their calculations of damages in this Wage Action.  *Id.*  Plaintiffs' provided Defendants a copy of their position statement.  *Id.*

The Mediation was held on May 13, 2008, at the offices of Defendants' Counsel.  Present at the Mediation were the Class Representatives and Opt-in Class Member Andi Healy, Defendants, Defendants' Counsel and Class Counsel.  Kirschenbaum Decl. ¶10.

Through the efforts of the Mediator, the Parties reached a preliminary agreement to settle the Wage Action.  However, this agreement almost fell apart in July 2008.  Kirschenbaum Decl. ¶11.  Defendant's Counsel argued that sushi chefs should receive a portion of the settlement amounts.  *Id.*  As some sushi chefs performed little to almost no customer services, Plaintiffs were unwilling to include sushi chefs in settlement class, on principle.  *Id.*  Moreover, Plaintiffs had an additional concern that the inclusion of sushi chefs in the class would diminish the recovery of the settlement class members.  *Id.*  After Class Counsel made clear that that the exclusion of sushi chefs was essential to the Settlement and that Plaintiffs were prepared to back out of the settlement, Defendants' counsel agreed to a settlement in which the sushi chefs were not members of the class.  *Id.*  Subsequently, the Parties had another dispute regarding the timing of payments due under the agreement.  Kirschenbaum Decl. ¶12.  Again, the Parties engaged in hard-fought negotiations regarding the timing of payment, and the assistance of the mediator was necessary to restore the settlement.  *Id.*

**E.    Settlement Terms.**

The Agreement provides that Defendants shall pay a total Gross Fund Value ("GFV") of Two Million, Five Hundred Thousand Dollars ($2,500,000.00) which includes attorneys' fees,

costs, taxes and any incentive awards.  Based on Class Counsel's assessment of the evidence produced by Defendants, this settlement fund represents approximately 60% of the Settlement Class' "best possible day" assuming, *inter alia*, (1) the Rule 23 class was certified; (2) the FLSA collective action remained certified; (3) Class Representative's claim of improper retention of tips was meritorious; and, (4) Class Representation's claim that Defendants failed to properly pay overtime was meritorious.

Class Members will receive an award without having to file a proof of claim or a claim form.  While Class Members employed within three years of the date of Preliminary Approval will be eligible for a small enhancement by submitting a Blue Consent to Join Form (for the FLSA collective action), *all* Class Members will received their base award regardless.

After the payment of attorneys fees and costs and small individual enhancements to four plaintiffs,[9] the Net Fund Value ("NFV") shall be distributed among Class Members that do not opt-out of the litigation ("Settlement Class Members") on a pro-rata basis determined by how many hours each Qualifying Class Member worked for Defendants during the Class Period. Defendants will withhold relevant taxes from these payments.

Due to the structuring to Defendants' tip-pools, certain positions lost more tips than other positions.  Waiters received more points (or a greater percentage of the tip-pool) than runners and bartenders, who received more points from the tip-pools than bussers.  As a result, money wrongly taken from the tip-pool had a greater impact on waiters than runners and bartenders (and it had a greater impact on runners and bartenders than bussers).  In other words, of the money that was allegedly misappropriated to tip-ineligible employees, the waiters lost the most, followed by the runners and bartenders, followed by bussers.  The settlement has been structured to reflect these differences.  The individual settlement amount shall be calculated as follows: Each employee will be classified by Class Counsel as either a "waiter," "runner," "busser," or

---

[9]  As discussed below, the settlement states that subject to Court approval, Class Counsel shall receive a contingent fee equal to 33 1/3% of the GFV, which equals $833,333.33.  (Class Counsel will pay all costs associated with this action from there contingent fee.)  The Agreement provides individual enhancement awards, subject to Court approval, to four plaintiffs (including to Class Representatives) totaling Forty Thousand Dollars  ($40,000.00).

"bartender," according to the last job held while employed at Defendants' restaurants.  (1) Each waiter will receive ten points for each working hour recorded in the Defendants' records during the applicable Claim Period; (2) Each runner will receive six points for each working hour recorded in the Defendants' records during the applicable Claim Period; (3) Each bartender will receive six points for each working hour recorded in the Defendants' records during the applicable Claim Period; and (4) Each busser will receive four points for each working hour recorded in the Defendants' records during the applicable Claim Period.  The Notice to Class Members explains this breakdown.

Each Settlement Class Member employed by Defendants during the FLSA Claim Period who submits a valid blue Consent to Join the FLSA claim form by the due date will have their points associated with their work during the FLSA Claim Period increased by three percent (3%).  This point enhancement is consistent with the increased damages available for FLSA claims.  *See* 29 U.S.C. § 216(b) (permitting a recovery for liquidated damages).

After the points for each Settlement Class Member is determined, Class Counsel will determine the pro rata share to which each Class Member is entitled by dividing each Class Member's points by the Total Points for *all* Class Members.  Class Counsel will then multiply this fraction by the NFV to determine the specific amount of money each Class Member will receive.

**F.**     **Factors Considered In The Settlement Of The Claims.**

The Parties weighed the weaknesses and complexities in their case against the benefits of receiving a large percentage of the damages sought without the inherent risks of litigation.   At all times throughout the Wage Action, Defendants continued to deny any liability or wrongdoing of any kind associated with the claims alleged in the Wage Action.

Plaintiffs have thoroughly analyzed Defendants' factual and legal defenses, reviewed the defenses with the Plaintiffs and several opt-ins, and accessed the strength of Defendants' arguments.   Amongst their defenses, Defendants allege that: (1) the tip pools were voluntary, during a portion - if not all - of the relevant time period; (2) Hiring and firing decisions are not made by employees in the tip pool; (3) All employees in the tip pool perform service duties; (4)

Floor Captains and Fronts are not managers under the law; and (5) Nobu's Sushi Chefs provided service to customers and could be in the tip pools.

### 1.    Sushi Chefs

Plaintiffs realized that they had an uphill battle arguing that Nobu's sushi chefs had been wrongly included in the tip pools.

Most of the Nobu's sushi chefs are visible to the public.  Although waiters take most customers' orders, some customers sit at Nobu's sushi bar and order sushi directly from a sushi chef.  These customers will be served their prepared food by either a waiter or a sushi chef.

In 1998, the New York Department of Labor issued an opinion letter finding that under New York Labor Law, a sushi preparer could "lawfully share in tips left by the restaurant's customers."  (NYDOL Opinion Letter of Sept. 16, 1998).  Similarly, the Department of Labor Field Operations Handbook has long recognized that  "counter personnel who serve customers" may take part in a tip pool under the FLSA (DOL Field Operations Handbook 30d04(a)).  Within the last month, the Department of Labor issued an opinion letter finding that sushi chefs who prepare and serve sushi to customers in a bar area may take part in a tip pool.  (DOL Wage and Hour Opinion Letter of Dec. 19, 2008, FLSA2008-18).[10]

However, even taking the above opinion letters and handbook into account, Plaintiffs still believed that they could argue for the return of tips distributed to sushi chefs who 1) had managerial duties or 2) performed little to virtually no customer service.

Ultimately, Plaintiffs obtained a settlement which resulted in the recovery of a substantial amount of the calculated damages for the class, and Plaintiffs received an excellent return on their claim for tip distribution to sushi chefs.

### 2.    Other Considerations

After extensive discussion, Defendants conveyed that they would entertain a settlement in which a significant percentage of the allegedly misappropriated tips was returned to class

---

[10] The Opinion Letters and a selection from the DOL Field Operations Handbook are attached.  *See* Kirschenbaum Decl., Exhibit B.

members; however, they would not also pay the tip-credit differential. Essentially, Defendants argued that this would result in class members receiving double recovery. Without making any concessions, Plaintiffs recognize that there is a punitive quality to seeking tip-credit differential in addition to the return of their misappropriated tips. Accordingly, Plaintiffs were willing to negotiate the settlement of the case solely on the amount of allegedly misappropriated tips.

Additionally, in considering the possibility of settlement, the Class Representatives and Class Counsel accounted for the time, delay, and costs of further discovery, motion practice, liability trial(s), damages trial(s), and appeal(s) by Defendants. The Parties also took into account that if Plaintiffs were successful at trial, Defendants would be required to pay their attorneys' fees.

### 3.   Conclusion

The consideration payable to Class Members is significant. Plaintiffs estimated that they obtained 60% of their best day.[11] Moreover, Pursuant to the Class Counsel's preliminary calculations, the average Class Member will receive approximately $3,300 a*fter* attorneys' fees of 33.33%. Of course, a waiter who worked for several years at Nobu would receive much more than the average, and a busser who only worked a week at Nobu would receive significantly less.

Based on Class Counsel's experience litigating these types of cases, the Settlement is highly favorable to the Class Members.

### G.   Class Members' Response To Settlement.

The response to the settlement was extremely positive. Counsel sent out 503 notices. Kirschenbaum Decl. ¶14. No objections to the settlement were received, and only two (2)

---

[11] Plaintiffs calculated their best day as follows: Plaintiffs estimated that there was approximately $1.7 million in tips that had been distributed to Fronts and Floor Captains. Plaintiffs estimated that approximately $4.9 million in tips had been distributed to sushi chefs. However, there was great variety in the Nobu sushi chefs. One sushi chef at each restaurant had managerial duties. Most sushi chefs served customers, although the amount of service varied. Obviously, Plaintiffs did not expect to recover significant - if any - tips from sushi chefs who performed substantive service. But Plaintiffs argued that they were entitled to the tips redistributed to sushi chefs who performed little to virtually no service to customers. Similarly, they argued that they should recover the tips redistributed to the sushi chefs with manager duties. Accordingly, Plaintiffs estimated that their best day included all of the tips distributed to Fronts and Floor Captains and half of the tips distributed to the sushi chefs (or $4.15 million). Due to the punitive quality of seeking to recover the tip-credit differential in addition to misappropriated tips, the tip-credit differential was not included in the best day calculation.

individuals opted-out of the class.  *See Kirschenbaum Decl.* ¶17.  One individual provided no reason for opting-out.  *Id.*  The other individual who opted-out simply stated that he had only worked at Nobu as a trainee and never had a full-time position.  *Id.*  Moreover, of the segment of the class members who were eligible to join the FLSA collection action, 197[12] of them executed and returned the blue opt-in form, granting consent to join the FLSA collective action and affirmatively approving the terms of the settlement.  Kirschenbaum Decl. ¶18.  Accordingly, there was clear approval of the settlement, as seen by the absence of objections and the high number of FLSA putative collective members' who executed and returned opt-in forms to receive the 3% premium.

## III.   ARGUMENT

### A.   The Proposed Settlement Should Be Approved.

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval for any compromise of claims brought on a class basis. *D'Amato v. Watman*, 236 F.3d 78, 84 (2d Cir. 2001)  Similarly, the FLSA requires either Court approval or the supervision of the Secretary of Labor prior to the compromise of an employees' claims for back wages.  *See* 29 U.S.C. § 216(c).

Approval of a settlement for a class action is within the Court's discretion, "which should be exercised in light of the general judicial policy favoring settlement."  *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008) (internal quotation omitted)  "The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d. Cir. 1974).

### 1.   The Proposed Settlement Class Satisfies The Requirements Of Rule 23.[13]

Prior to granting preliminary approval of a settlement, district courts determine whether the proposed settlement class meets the requirements of Rule 23.  *Taft v. Ackermans*,

---

[12] This number is accurate as of January 29, 2009.

[13] For reasons set forth below supporting commonality and typicality, putative class members are similarly situated, and an FLSA collective action may be certified for settlement purposes.  *See*  29 U.S.C. § 216(b).

No. 02Civ.7951(PKL), 2007 U.S. Dist. LEXIS 9144, at *8 (S.D.N.Y. Jan. 31, 2007). A proposed class may be certified when it is shown that there is: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy, and where one of the Rule 23(b) requirements is met. Fed. R. Civ. P. 23. *See also Taft*, 2007 U.S. Dist. LEXIS 9144, at *8. Here, the proposed class meets numerosity, commonality, typicality, and adequacy standards, as well as Rule 23(b)(3)'s standard that "questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

### a.    Plaintiffs Have Met All Of The Prerequisites Under Rule 23(a).

#### 1)    Numerosity Is Satisfied.

The Parties estimate that the Class includes hundreds of members. Thus, the Class is so numerous that joinder of all Class members is impracticable. *See Taft*, 2007 U.S. Dist. LEXIS 9144, at *8. (holding that numerosity is satisfied if the class exceeds forty).

#### 2)    Commonality Is Satisfied.

There are several questions of law and fact common to the Settlement Class. Among these questions are: (i) whether Defendants employed Plaintiffs and the Class within the meaning of New York State and federal law; (ii) whether Floor Captains or "Fronts" were managers who were barred from taking part in Defendants' tip pool; (iii) whether sushi chefs performed sufficient service duties to take part in the tip pools; (iv) whether Defendants or their agents retained portions of the Settlement Class' tips; and (v) whether Defendants properly paid Plaintiffs and Class Members their minimum wage and overtime.

As each of the three restaurants in which Settlement Class Members worked applied common practices and procedures, the commonality requirement is easily satisfied. *See Daniels v. City of New York,* 198 F.R.D. 409, 417 (S.D.N.Y. 2001) ("[t]he commonality requirement will be met if the named Plaintiffs share a common question of law or fact with the grievances of the prospective class.").

11

### 3)    Typicality Is Satisfied.

Similarly, the typicality requirement is satisfied because the Class Representatives' claims "arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *Taft*, 2007 U.S. Dist. LEXIS 9144, at *9 (internal quotation)  Further, the claims of both the Class Representatives and the proposed Class Members rely on "similar legal arguments" that Defendants failed to properly compensate them.  *See Robinson v. Metro North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir. 2001).

### 4)    Adequacy Is Satisfied.

Finally, Class Representatives are adequate representatives of the proposed class and have fairly and adequately represented and protected the interests of all Settlement Class Members in achieving this settlement.  The Class Representatives have no known conflicts with any Settlement Class Members.

Moreover, the Settlement Class Members are represented by two of the premiere wage and hour litigation firms in the nation.  *See* Kirschenbaum Decl. ¶¶19-41.  Class Counsel conducted a thorough pre-filing and continuing investigation, vigorously prosecuted the lawsuit, and negotiated a settlement that provides prompt and valuable relief to Class Members.  *See Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (class counsel will be deemed adequate if it has no conflicts to any class member and if they are "qualified, experienced and able to conduct the litigation.").

### b.    The Court Should Certify The Settlement Class Under Rule 23(b)(3).

Certification is appropriate because, as set forth above, the predominance and superiority requirements of Rule 23(b)(3) are satisfied.  The above-described common questions of law and fact predominate over any individual issues such as the nature and extent of damages. *See Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 86 (S.D.N.Y. 2001) ("It is well-established that individual questions with respect to damages will not defeat class certification . . . unless that issue creates a conflict which goes to the heart of the lawsuit.")

Additionally, a class action is superior to other available methods for the fair and efficient

adjudication of the controversy because joinder of all Settlement Class Members is impossible. Moreover, as the damages suffered by individual members of the Settlement Class are relatively small compared to the expense and burden of individual litigation, it would be exceedingly difficult for all Settlement Class Members to individually redress the harm done to them. *See Taft*, 2007 U.S. Dist. LEXIS 9144, at *12 (finding that a class action was a superior method of adjudicating the case as it provided "a recovery to class members who otherwise would not find it cost-effective to pursue their claims.")[14]

2.   **The Proposed Settlement Is Fair, Reasonable, And Adequate And Should Be Approved.**

In ascertaining whether a settlement should be approved, a Court considers the fairness of the settlement by looking at the negotiating process which lead to the settlement as well as the substantive terms of the settlement. *D'Amato*, 236 F.3d at 84. As this settlement was negotiated prior to class certification, "it is subject to a higher degree of scrutiny in [the assessment of] its fairness." *Id.*

a.   **Procedural Fairness.**

"[A] strong presumption of fairness attaches to a class action settlement reached in arm's-length negotiations among counsel." *In re Telik,* 576 F. Supp. 2d at 576. "The experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves shed light on the fairness of the negotiating process." *Hicks v. Morgan Stanley & Co.*, No. 01Civ.10071(RJH), 2005 U.S. Dist. LEXIS 24890, at *13 (S.D.N.Y. Oct. 24, 2005) (internal quotation omitted)

Here, Class Counsel is represented by experienced counsel who have served as lead counsel on many local and national class and collective actions under the FLSA and state wage and hour laws, including class actions brought in New York in which significant monetary

---

[14] *See also Ansoumana,* 201 F.R.D. at 89 ("[t]he interest of the class as a whole to litigate the predominant common questions substantially outweighs any interest by individual members to bring and prosecute separate actions.").

awards were obtained for class members.[15]   Kirschenbaum Decl. ¶¶29-30, 36.   As the parties engaged in extensive, arms-length negotiation with the help of an impartial, experienced wage and hour mediator, the settlement is entitled to a presumption of adequacy and fairness.  *See In re: Priceline.com, Inc. Sec. Litig.*, No. 3:00-CV-1884(AVC), 2007 U.S. Dist. LEXIS 52538, at *9 (D.Conn. July 20, 2007).   Furthermore, the fact that the provisional agreement almost fell apart in July 2008 is further evidence that the parties were negotiating at arm's length and that there was no collusion.  *See Warren v. Xerox Corp.*, No. 01-CV-2909(JG), 2008 U.S. Dist. LEXIS 73951, at *13 (E.D.N.Y. Sept. 19, 2008)

<b>b.    Substantive Fairness.</b>

Courts in this circuit review a proposed settlement agreement for substantive fairness according to the factors identified in *Grinnell*: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of the reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  495 F.2d at 463.  *See also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96, 117 (2d Cir. 2005).  These factors ought not be applied in a formulistic fashion; rather, "the evaluation of a proposed settlement requires an amalgam of delicate balancing, gross approximations and rough justice." *Grinnell*, 495 F.2d at 468 (citing *Saylor v. Lindsley*, 456 F.2d 896, 904 (2d Cir. 1972)).

<b>1)    The Complexity, Expense And Likely Duration Of The Litigation.</b>

To assess the substantive fairness of a settlement, courts weigh the benefits of a potential settlement against the time and expense of continued litigation. *See Maley v. Del Global*

---

[15]  *See Velez v. Majik Cleaning Serv.*, No. 03Civ.8698(SAS)(KNF), 2007 U.S. Dist. LEXIS 46223, at *14 (S.D.N.Y. June 22, 2007) (finding that the fact that lead counsel had successfully represented class actions and labor-law cases similar to the underlying case supported a finding that settlement procedure was fair.)

14

*Technologies Corp.*, 186 F. Supp. 2d 358, 361-362 (S.D.N.Y. 2002)

"[M]ost class actions are inherently complex and settlement avoids the costs, delays and multitude of other problems associated with them." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 184-185 (W.D.N.Y. 2005) (internal quotation omitted)  If the case continues, there will be significant costs which will deplete any recovery, including: numerous depositions, extensive document production and review, trial, and possible appeals.  Moreover, there is likely to be significant motion practice.  For example, Plaintiffs will move for class certification which Defendants may oppose.  The parties will also presumably move for summary judgment to narrow the issues.  All of this will result in significant costs and great delay in the resolution. *See Gilliam v. Addicts Rehab. Ctr. Fund*, No. 05Civ.3452(RLE), 2008 U.S. Dist. LEXIS 23016, at *10 (S.D.N.Y. Mar. 24, 2008)  Furthermore, as detailed above, the key issues in the case are not straightforward and are vigorously disputed by the parties.

### 2)    The Reaction Of The Class To The Settlement.

In evaluating the degree of class members' support for a settlement, courts look to the proportion of the class that formally object to the settlement and the proportion of class members who opt-out.  Where relatively few class members opt-out or object to the settlement, the lack of opposition supports approval of the settlement. *See In re Sony SXRD Rear Projection Television Cass Action Litig.*, No. 06Civ.5173(RPP), 2008 U.S. Dist. LEXIS 36093, at *18 (S.D.N.Y. May 1, 2008) ("The small number of opt-outs and relative to the size of the class in this case supports approval of the Settlement.")

This factor weighs heavily in favor of approving the proposed Settlement.  Class Counsel mailed 503 class notices.  Kirschenbaum Decl. ¶14  Not a single person objected to the proposed Settlement. *Id.* ¶17. Only two people, approximately 0.4%, opted-out of the settlement, and they did not express any objection or displeasure with the terms of the settlement. *Id.*  In contrast, 197 Class Members have affirmatively opted-in to the FLSA collective action to approve their 3% premium. *Id.* ¶18.   The total absence of any objectors, the minute number of opt-outs, and the significant affirmation by FLSA collective members (who make up only a segment of the

total class) all demonstrate the Class Members' satisfaction with the Settlement's terms.

### 3) The Stage Of The Proceedings And The Amount Of Discovery Completed.

Courts also consider how far the litigation has progressed and the amount of discovery completed to gauge whether the parties are sufficiently informed to enter into a fair and adequate settlement. *See* Velez, 2007 U.S. Dist. LEXIS 46223, at *18. Parties need not have engaged in extensive discovery to have a proposed settlement approved. *Maley*, 186 F. Supp. 2d at 363. Instead, the Courts look to whether "the parties conducted sufficient discovery to understand their claims and negotiate settlement terms." *In re Sony*, 2008 U.S. Dist. LEXIS 36093, at *20.

Class Counsel entered into the proposed Settlement with a thorough understanding of their case. As set forth above, Class Counsel analyzed extensive documents, received information from Defendants' corporate representatives, and interviewed several plaintiffs and class members.

### 4) The Risks Of Establishing Liability.

"In assessing the Settlement, the Court should balance the benefits afforded to members of the Class and the immediacy and certainty of a substantial recovery against the continuing risks of litigation." *Maley*, 186 F. Supp. 2d at 364. Courts note that, regardless of the perceived strengths of plaintiffs' case, liability is "no sure thing." *Wal-Mart Stores,* 396 F.3d at 118.

As discussed above, Defendants asserted legal and factual defenses to the underlying claims in this lawsuit. There are extensive risks of establishing liability, especially as much of their alleged damages is based upon the argument that sushi chefs could not be in the tip pool. Further, juries are unpredictable. The proposed Settlement is preferable to costly, protracted litigation, which may result in a smaller per-plaintiff recovery.

### 5) The Risks Of Establishing Damages.

Courts also consider the risks of establishing damages. Regardless of plaintiffs' ability to establish liability, they still face the "substantial risks in proving its damages at trial." *In re Painewebber Ltd. P'ships. Litig.,* 171 F.R.D. 104, 128 (S.D.N.Y. 1997); *Wal-Mart Stores*, 396

F.3d at 119. Courts caution that "damages are a matter for the jury, whose determinations can never be predicted with certainty." *In re Painewebber Ltd. P'ships. Litig.,* 171 F.R.D. at 128.

Plaintiffs may have difficulty establishing the full extent of class-wide damages at trial. Some of Plaintiffs' claims are not reflected in Defendants' records and would have to be established through testimony and reference to other documents. Therefore, the value of Plaintiffs' claims could be significantly impacted by the jury's assessment of the Plaintiffs' credibility and/or the reasonableness of the Defendants' explanations. *Maley,* 186 F. Supp. 2d. at 365 (recognizing that a jury may award plaintiffs only a fraction of their alleged damages.)

      **6)  The Risks Of Maintaining The Class Action Through The Trial.**

Courts also weigh the risks of maintaining the class action through trial in determining whether the proposed settlement is fair. Specifically, courts consider whether a class is already certified or whether plaintiffs will move for class certification, whether Defendants will oppose certification, and whether the case could be decertified. *See Glover v. Crestwood Lake Section 1 Holding Corp.,* No. 89Civ.5386(MJL), 1991 U.S. Dist. LEXIS 4995, at *17-18 (S.D.N.Y. Apr. 10, 1991). *See also D.S. v. New York City Dep't of Educ & N.Y. City Bd. of Educ.,* No. 05-CV-4787, 2008 U.S. Dist. LEXIS 96034, at *52 (E.D.N.Y. Nov. 25, 2008) ("the risk that the class or subclass may be decertified generally weighs in favor of settlement.") Courts also consider the "pressure of active adversarial proceedings on named plaintiffs" and the potential affect on their ability to represent the class. *See Glover,* 1991 U.S. Dist. LEXIS 4995, at *18.

If the proposed Settlement is not approved, Plaintiffs will move for class certification of the state class and conditional certification of the FLSA collective action. These motions will be time-consuming and costly, and Defendants would likely oppose the motion. Although Plaintiffs believe that the Court would approve both class certification and condition certification, there is a possibility that class and conditional certification would either not be granted or that the classes would be later decertified.

**7)     The Ability Of The Defendants To Withstand A Greater Judgment.**

Next, courts consider the defendants' ability to withstand judgment greater than the settlement.  *D.S.*, 2008 U.S. Dist. LEXIS 96034, at *52.   Nevertheless, the fact that a defendant can withstand a greater judgment does not undermine a finding that the settlement was fair, reasonable, and adequate.  *Id.*

Plaintiffs are not fully aware of Defendants' financial abilities.   However, Plaintiffs recognize that the restaurant industry is generally a low-margin industry and that a payout of this size is significant to Defendants.

**8)     The Range Of Reasonableness Of The Settlement Fund In Light Of The Best Possible Recovery And The Attendant Risks Of Litigation.**

The final two Grinnell factors can be considered together.  *See, e.g. In re Sony*, 2008 U.S. Dist. LEXIS 36093, at *24; *D.S.*, 2008 U.S. Dist. LEXIS 96034, at *53.  "The most important factor in the court's assessment of the proposed settlement is the 'strength of the case for plaintiffs on the merits, balanced against the [relief] offered in settlement.'"  *D.S.*, 2008 U.S. Dist. LEXIS 96034, at *53 (quoting *Grinnell,* 495 F.2d at 455)

The "best possible recovery" is based upon an assessment of what Plaintiffs' could obtain if they 1) were successful on the merits, 2) were successful in arguing the extent of damages, and 3) were awarded damages for the full class period.  *Maley*, 186 F. Supp.2d at 365.  The "best possible recovery" assessment is limited by Defendants ability to pay.  *Id.*

"The determination whether a settlement is reasonable does not involve the use of mathematical equation yield a particularly sum."  *Frank*, 228 F.R.D. at 186. (internal quotation omitted).  "Instead, there is a range of reasonableness with respect to a settlement -- a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  *Id.* (internal quotation omitted)   The risks and costs of litigation include the risks "of having to prove, liability, establish damages, and maintain the class action through trial. . . ."  *D.S.*, 2008 U.S.

Dist. LEXIS 96034, at *53.

These factors weigh in favor of approval of the settlement.  As discussed above, Plaintiffs face substantial risks in proving and collecting their best possible recovery.  Moreover, the Settlement provides the significant benefit of an immediate substantial to Class Members, rather than "speculative payment of a hypothetically larger amount years down the road." *Teachers' Ret. Sys. v. A.C.L.N., Ltd*., 2004 U.S. Dist. LEXIS 8608, at *16 (S.D.N.Y. May 14, 2004)  As discussed above, the Class Members stand to recover a very significant percentage (approximately 60%) of their "best case scenario" damages.

Under the totality of the circumstances, the *Grinnell* factors strongly favor the Settlement. Although Plaintiffs might recover more than the settlement amount at trial, there are significant risks including Defendants' stated defenses and arguments against class/collective treatment, uncertain damages, lost time-value of money, risks of collection. The Settlement commits a significant amount of money to compensate class members for their damages.  When this monetary relief is weighed against the potential obstacles and costs of further litigation, the benefits to the class of settlement are overwhelming. This conclusion is borne out by the total absence of objectors, the very low number of opt-outs, and the substantial affirmative support from the Class Members.

### 3.    The Notice to Class Members Meets the Requirements of Rule 23.[16]

For any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.  The notice must clearly and concisely state in plain, easily understood language:

(i)      the nature of the action;
(ii)     the definition of the class certified
(iii)    the class claims, issues, or defenses;
(iv)    that a class member may enter an appearance through an attorney if the member so desires;

---

[16] A copy of the notice to class members is attached hereto.  Kirschenbaum Decl., Exhibit C.  In the originals sent to each class member, the final page is blue.

(v)     that the court will exclude from the class any member who requests exclusion;

(vi)    the time and manner for requesting exclusion; and

(vii)   the binding effect of a class judgment on members under Rule 23(c)(3)

Fed. R. Civ. P.23(c)(2)(B). "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'" *Wal-Mart Stores,* 396 F.3d at 114 (internal citations omitted).

Here, Class Counsel mailed the Class Notice Forms via first class mail to all Settlement Class Members at their last known addresses as maintained by Defendants.  For each Class Notice returned to Class Counsel as undeliverable, Class Counsel attempted a skip trace.  Those individuals who were located using the skip trace were sent an additional copy of the Class Notice.

The class notice plainly and concisely provided the necessary information regarding the lawsuit and class certification pursuant to Rule 23(c)(2)(B). The notice also described: (1) the terms of settlement; (2) how an eligible class member could opt-in to the FLSA collective action; (3) how class members' recovery will be calculated; (4) the relief available to Settlement Class Members; (5) the reasons the parties are proposing the settlement; (6) the date, time and place of the formal Fairness Hearing;[17] (7) the procedures for objecting to the settlement and appearing at the Fairness Hearing; and (8) the incentive awards being sought.  Finally, the notice provided the contact information for Class Counsel and explained that Class Counsel would seek 33.33% ($833,333.33) of the total settlement award as attorneys' fees.

### 4.    Incentive Payments Should Be Awarded To The Named Class Representatives And Select Opt-in Class Members.

Under the proposed settlement agreement, and subject to the Court's approval, a separate $10,000 payment is be awarded to each of the Named Class Representatives, as well as the Opt-

---

[17] Class Counsel sent a letter mailing notifying all class members of the adjournment of the original fairness hearing and provided the new date.  Kirschenbaum Decl. ¶16.

in Class Members Andi Healy and Hiro Matsumoto.

> Incentive awards are not uncommon in class action cases and are within the discretion of the court.   In calculation incentive fees, courts consider: The existence of special circumstances include the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and of course, the ultimate recovery.

*Frank*, 228 F.R.D. at 187 (internal quotation omitted).   "Incentive awards are "particularly appropriate in the employment context . . . where the plaintiff is often a former or current employee of the defendant, and thus, [as a result of his/her involvement in a class action for the benefit of the class as a whole], undertaken the risk of adverse actions by the employer or co-workers." *Id.*; *Velez*, 2007 U.S. Dist LEXIS 46223, at *23 (same).

The Named Class Representatives and opt-ins Andi Healy and Hiro Matsumoto all expended considerable time and effort with Class Counsel and assisted with the case.[18]   The Named Class Representatives and Ms. Healy and Mr. Matsumoto were instrumental in the initiation and investigation of the case.[19]   These individuals spent time reviewing documents, explaining the relevant and necessary factual information to Class Counsel, and evaluating Defendant's defenses.[20]   They spent significant time speaking to current or former employees of Defendants about the case and encouraging their participation.[21]   Due to the efforts of these individuals, important evidence and new opt-in members for the class action were acquired.[22] Mr. Pou, Ms. Agafonova, and Ms. Healy attended the 12-hour mediation and were active in the

---

[18] *See* Declaration of Aaron Pou ("Pou Decl."), Declaration of Alisa Agafonova ("Agafonova Decl."), Declaration of Andi Rae Healy ("Healy Decl."), and Declaration of Hiro Matsumoto ("Matsumoto Decl.").

[19] *See* Pou Decl. ¶¶3-7; Agafonova Decl. ¶¶3-7; Healy Decl. ¶¶3-5, 9-10,12; Matsumoto Decl. ¶¶3-11.

[20] *See* Pou Decl. ¶¶5-8,14; Agafonova Decl. ¶¶6,7,18-19,22; Healy Decl. ¶¶4-5,11,14; Matsumoto Decl. ¶¶5,7,15.

[21] *See* Pou Decl. ¶¶4,9-12,15; Agafonova Decl. ¶¶11-17,19-21,23; Healy Decl. ¶¶3-4,7-8; Matsumoto Decl. ¶¶6-14,16-18.

[22] *See* Pou Decl. ¶¶5,11-12; Agafonova Decl. ¶¶7,18-21; Healy Decl. ¶¶5,9-14; Matsumoto Decl. ¶6-7,10-11,13.

resolution of the case.[23]   Furthermore, an incentive award is justified to these four people because they were potentially -- if not, in fact -- subjected to retaliation because of the lawsuit and their complaints of improper pay.[24]

The incentive payment totaling $40,000 for four plaintiffs is extremely modest in comparison with those approved by others courts,[25] and represents approximately 1.6% of the Settlement Funds.  Because of their time, assistance, development of the case, and subjection to (at the very least) fear of retaliation, the payments to the named representatives are appropriate and justified as part of the overall Settlement.

### 5.        Class Counsel's Attorneys Fees Should be Approved.

Under the Settlement Agreement (as well as the engagement agreements signed by the named plaintiffs), Class Counsel is permitted to receive one-third of the common fund as attorney's fees.  Class Counsel will utilize the funds awarded as attorneys' fees to cover costs and expenses which have been occurred in the case.

"Pursuant to the equitable or common fund doctrine . . . attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work."  *In re Telik,* 576 F. Supp. 2d at 584-585 (internal quotations omitted)   "Fees and expenses are paid from the common fund so that all class members contribute equally towards the costs associated with litigation pursued on their behalf. *Id.* at 585. The award of attorneys fees has the three fold benefit of 1) "providing just compensation," 2) "encourag[ing] skilled counsel to represent those who seek redress for damages inflicted on

---

[23] *See* Pou Decl. ¶14; Agafonova Decl. ¶22; Healy Decl. ¶¶13-14.

[24] *See* Pou Decl. ¶¶4,9; Agafonova Decl. ¶¶8-10; Healy Decl. ¶¶4,6,15; Matsumoto Decl. ¶¶7-9,16,19-20.

[25] *See, e.g., RMED Int'l v. Sloan's Supermarkets,* No. 94Civ5587(PKL)(RLE), 2003 U.S. Dist. LEXIS 8239, at *7(S.D.N.Y. May 15, 2003) (awarding an incentive award of $25,000 for a single named plaintiff); *Strougo*, 258 F. Supp. 2d at 263-264 (awarding an incentive payment of $15,000 for one individual); *Sheppard v. Consolidated Edison Co. of New York, Inc.,* No. 94-CV-0403(JG), 2002 U.S. Dist. LEXIS 16314 at *20 (E.D.N.Y. Aug. 1, 2002) (approving aggregate incentive payment of $119,167 for six named plaintiffs in a race discrimination class action); *Roberts*, 979 F. Supp. 185, 188-189, 1997 U.S. Dist. LEXIS 17056, at *4-8 (S.D.N.Y. 1997) (incentive payment of $212,500 for six named plaintiffs in a race discrimination class action)

entire classes of persons, and 3) "discourag[ing] future misconduct of a similar nature." *Id.*

The Second Circuit has recognized that a district court may calculate reasonable attorney fees by either the lodestar method and the percentage method. *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000). Under the lodestar method "the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate." *Id.* at 47 "Once the lodestar is calculated the court "may, in its discretion, increase the lodestar by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys." *In re Telik,* 576 F.Supp 2d at 585 (quoting *Goldberger,* 209 F.3d at 47)

Under the percentage method, the Court "sets some percentage of the common fund as a fee. In determining what percentage to award, courts have looked to the same 'less objective' factors that are used to determine the multiplier for the lodestar." *Goldberger,* 209 F.3d at 47 (internal citation omitted). Under either method, the purpose is to award a "reasonable" amount. *Id.* The determination of a reasonable fee is left to the district court's "sound discretion." *Id.*

"The trend in the Second Circuit recently has been to use the percentage method." *Hicks v. Morgan Stanley & Co.* 2005 U.S. Dist. LEXIS 24890, at *22. "The percentage method, though not without flaws, is often preferable to the lodestar method to determine attorneys' fees in class actions because it reduces the incentive for counsel to draft the case out to increase the number of hours billed; also fewer judicial resources will be spent in evaluating the fairness of the fee petition." *Hicks,* 2005 U.S. Dist. LEXIS 24890, at *23. *See also Wal-Mart Stores,* 396 F.3d at 122 (internal quotation omitted) (recognizing that amongst its problems, a strict lodestar approach "creates an unanticipated disincentive to early settlements [and] tempt[s] lawyers to run up their hours). "In addition the percentage method is consistent with and, indeed, is intended to mirror, practice in the private marketplace where contingent fee attorneys typically negotiate percentage fee agreements with their clients." *Strougo v. Bassini,* 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003).

However, "[t]he lodestar remains useful as a baseline even if the percentage method is

eventually chosen." *Hicks*, 2005 U.S. Dist. LEXIS 24890, at *23 (quoting *Goldberger*, 209 F.3d at 50.) "The Second Circuit encourages the practice of performing a lodestar "cross-check" on the reasonableness of a fee award based on the percentage approach." *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05Civ.10240(CM), 2007 U.S. Dist. LEXIS 57918, at *53 (S.D.N.Y. Feb. 16, 2007)

### a.    Class Counsel's Requested Fee Award Is Reasonable.

Pursuant to their retainer agreement with Plaintiffs and the proposed settlement agreement, Class Counsel seeks an award of 33.33% for attorneys fees and costs. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (recognizing that the fee agreed upon by lead plaintiffs may "offer the best indication of a market rate"). Class Counsel will pay all incurred costs and expenses from the portion of the fund that it is awarded, and thus, will not be seeking a separate award for costs. The percentage of the fund sought is consistent with the norms of class litigation in this circuit. *See, e.g., Cent. States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d at 249 (2d Cir. 2007) (affirming district court's award of attorneys fees and costs equal to 30% of the settlement fund ($42.5 million)); *Warren*, 2008 U.S. Dist. LEXIS 73951, at *22 (awarding 33.33% of the settlement fund ($12 million) for fees and costs). *Maley,* 186 F. Supp. 2d at 367-368, 370 (awarding fees of 33 1/3 % of the settlement fund ($11.5 million) and recognizing that courts in this circuit have awarded fees as large as 50% of the settlement fund).[26]

"As the size of the settlement fund increases, the percentage of the fund awarded as fees

---

[26] *See also, e.g.  Gilliam*, 2008 U.S. Dist. LEXIS 23016, at *15 (awarding fees of 33.33 % of the settlement fund ($450,000) plus costs); *In re Bisys Securities Litig*., No. 04Civ.3840(JSR), 2007 U.S. Dist. LEXIS 51087, at *10 (S.D.N.Y. July 16, 2007) (awarding fees of 30% of settlement fund ($65,870,000)); *Spann v. AOL Time Warner, Inc*., No. 02Civ.8283(DLC), 2005 U.S. Dist. LEXIS 10848, at *24 (S.D.N.Y. June 7, 2005) (approving attorneys fees of 33 1/3 % of settlement fund ($2.9 million) plus costs and expenses); *In re Blech Sec. Litig.,* No. 94Civ.7696, 2002 U.S. Dist. LEXIS 23170, at *5 (S.D.N.Y. Dec. 4, 2002) (approving fees of 33 1/3% of settlement fund ($12 million) plus costs; *Frank*, 228 F.R.D. at 189 (awarding attorneys fees of 40% of the settlement fund ($125,000) for fees, costs, and expenses) *RMED Int'l v. Sloan's Supermarkets,* 2003 U.S. Dist. LEXIS 8289, at *1-2 (awarding fees of 32.5 % fees of the settlement fund ($975,0000) plus $97,741.67 in costs); *Strougo,* 258 F. Supp. 2d at 263 (awarding fees of 33 1/3% of the settlement fund ($1.5 million) for attorneys' fees.)

often decreases so as to prevent a windfall to plaintiffs' attorneys. A settlement amount of $10 million does not raise the windfall issue in the same way as would a $100 million settlement, and a 30% fee does not produce such a windfall." *Hicks,* 2005 U.S. Dist. LEXIS 24890, at *25 (internal citation omitted)  Unlike a class action in which the parties settled for hundreds of millions of dollars, a 33.33% award for attorneys fees would not be a windfall to Class Counsel (especially because Counsel will pay the costs and expenses out of this portion.)[27]

Counsel invested over $192,000.00[28] worth of time in obtaining a fair settlement for the Class.  Counsel now seeks 33.33% of the settlement fund ($833,333.33) in attorneys fees.  This amounts to a 4.34 multiplier of the lodestar.  "Under the lodestar method of fee computation, a multiplier is typically applied to the lodestar." *Taft*, 2007 U.S. Dist. LEXIS 9144, at *34.  *See also In re Lloyd's American Trust Fund Litig.*, No. 96Civ.1262(RWS), 2002 U.S. Dist. LEXIS 22663, at *79 (S.D.N.Y. Nov. 26, 2002)  (same).  "The multiplier represents, among other factors, the risk of litigation, the complexity of the issues, the contingent nature of the engagement, and the skill of the attorneys." *Taft*, 2007 U.S. Dist. LEXIS 9144, at *34.  "In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."  *In re Telik*, 576 F. Supp. 2d at 590.  Indeed, "multipliers of between 3 and 4.5 have become common." *Wal-Mart Stores*, 396 F.3d at 123 (quoting *NASDAQ Market-Makers,* 187 F.R.D. 465, 489 (S.D.N.Y. 1998).  *See also In re EVCI*, 2007 U.S. Dist. LEXIS 57918, at *56 n.7 ("Lodestar multipliers of nearly 5 have been deemed "common" by courts in this District.") (collecting cases); *Karpus v. Borelli (In re Interpublic Secs. Litig.)*, Nos. 02Civ.6527(DLC), 03Civ.1194(DLC), 2004 U.S. Dist. LEXIS 21429, at *1 (S.D.N.Y. Oct. 26, 2004) (awarding

---

[27] *In re EVCI*, 2007 U.S. Dist. LEXIS 57918, at *57 (recognizing that it is generally appropriate to award Class Counsel expenses incurred in the litigation).

[28] *See* Kirschenbaum Decl. ¶44 (Chart of billing rates).  Class counsel's billing rates is consistent with "the hourly rate that is normally charge in the community [New York, New York] where counsel practices. . . . " *Strougo*, 258 F. Supp. 2d at 263.  *See e.g. Rozell v. Courtney Ross-Holst*, 576 F. Supp. 2d 527, 546 (S.D.N.Y. 2008) (in a New York employment case the Court found that the following were reasonable rate:  partner -- $600; senior associate -- $350; junior associate -- $250; law clerk -- $175; paralegals -- $125.)  *See also In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d at 589 (finding that in a securities law class action, the following rates were reasonable: partner -- $700-750; associates -- $300-550)

attorneys fees with a lodestar multiplier of 3.96).

        **b.**     **The *Goldberger* Factors.**

Regardless of whether the percentage or lodestar method is used, courts consider: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of litigation; (4) quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *See Goldberger*, 209 F.3d 43, 50.

        **1)**     **Counsel's Time And Labor.**

The first factor examines the time and labor expended by counsel in achieving the settlement. Class Counsel served discovery requests; interviewed plaintiffs and several class members; analyzed job position documents and an extensive collection of wage and payroll records, including but not limited to, daily time sheets, ADP reports, daily and weekly payroll worksheets, tip-sheets, and electronic time cards; engaged in detailed conversations with Defense Counsel about the substance and value of the case; and created a comprehensive damage estimate based upon these records and information. *See* Kirschenbaum Decl. ¶¶2-7. In an attempt to resolve the matter, Class Counsel drafted a substantial mediation statement, 138 pages with exhibits, and engaged in a mediation which lasted over 12 hours. *Id.* ¶¶9-10.

Although the parties provisionally agreed to a settlement; the settlement almost fell through in the following months. However, with the help of the mediator and intense settlement talks between counsel for the parties, the settlement was put back on track. Kirschenbaum Decl. ¶¶11-12. Counsel from both parties worked together to craft the settlement agreement. *Id.* ¶13. *See Maley*, 186 F. Supp. 2d at 371-372 (finding that investigation into the case, briefing of court documents, court appearances, and participation in settlement negotiation amounted to a reasonable expenditure of time)

Throughout the course of this litigation, Counsel made dozens of calls from Plaintiffs regarding the facts underlying the case, and responded to numerous calls regarding the case. *See* Kirschenbaum Decl. ¶3. By the time of settlement, Class Counsel represented 48 current and former employees of Defendant restaurants. *Id.* The employees had Mr. Kirschenbaum's cell

phone number for after-hours access. *Id.* Mr. Kirschenbaum was available around the clock and on weekends to accommodate the plaintiffs' work schedules. *Id.*. The employees' used this resource frequently. *Id.* Through this constant contact with the 48 Plaintiffs, Class Counsel kept the Class Members informed and involved in the action. *Id.*

In their representation of the class, Class Counsel expended over 355 attorney hours in this case and had 315 paralegal hours in this case. *See* Kirschenbaum Decl. ¶44. Further, Class Counsel have ongoing duties in administering the settlement which will require additional professional time. *Id.* ¶45.

Class Counsel has been able to keep the expenses and number of attorney hours fairly low by litigating this action in an efficient and cost-effective manner. Class Counsel worked to limit the duplication of effort and assigned work to the lowest billing timekeepers (often, paralegals) when feasible. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 467 (S.D.N.Y. 2004) (supporting counsel's efforts to "minimize unnecessary duplication of work.").

### 2) The Litigation's Magnitude And Complexity.

While obviously not as complex as certain antitrust or securities class actions, the "magnitude and complexity" of this case should be evaluated by comparison to other *wage and hour* class actions. With approximately 503 class members, this Class is large compared to many other wage and hour class actions. *See, e.g. Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152 (S.D.N.Y. 2008) (270 class members); *Gilliam*, 2008 U.S. Dist. LEXIS 23016, at *4 (245 class members).[29] Further, the Class Members worked in many different positions at three different restaurants, requiring Class Counsel to do a broad investigation into the underlying facts.

### 3) The Risks Of Litigation.

"Courts of this Circuit have recognized the risk of litigation to be perhaps the foremost factor to be considered in determining the award of appropriate attorneys' fees." *Taft*, 2007 U.S.

---

[29] *See also Guzman v. VLM, Inc.*, No. 07-CV-1126(JG)(RER), 2008 U.S. Dist. LEXIS 15821, at *15 (E.D.N.Y. Mar. 02, 2008) (133 class members); *Toure v. Cent. Parking Sys.*, No. 05Civ.5237(WHP), 2007 U.S. Dist. LEXIS 74056, at *15 (46 class members); *Niemiec v. Ann Bendick Realty*, No. 1:04-cv-00897-ENV-KAM, 2007 WL 5157027, at *6 (E.D.N.Y. April 23, 2007) (127 class members); *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 266 (D.Conn. 2002) (281 class members).

Dist. LEXIS 9144, at *30 (internal quotations and citation omitted). Plaintiffs' Counsel took this case pursuant to retainer agreements with the named plaintiffs which stated that Counsel would receive 33% of the recovery *only if* Plaintiffs obtained a recovery.  Had Plaintiffs not obtain a recovery, Counsel would have received no payment for their work.  While Class Counsel believed strongly in this case from the start, a successful resolution was far from assured.

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*In re Telik*, 576 F. Supp. 2d at 592 (quoting *Grinnell* 495 F.2d at 470.)  *See also In re Global Crossing*, 225 F.R.D. at 467 ("The contingent nature of . . . Lead Counsel's representation is a key factor in determining a reasonable award of attorneys' fees.")

As discussed above, this case is rife with mixed questions of fact and law.  For example, it is a question of law whether a Floor Captain or Front who has some managerial qualities but does not have the authority to hire and fire can be in a tip-pool.  As discussed extensively above, there are great risks that Plaintiffs will not be successful in their claim that tips were wrongly distributed to sushi chefs.  Additionally, some of the damages in this case would need to be established by testimony.  *See In re Veeco Instruments Secs. Litig.*, No. 05MDL01695(CM), 2007 U.S. Dist. LEXIS 85554, at *29-30 (S.D.N.Y. Nov. 7, 2007) (identifying the difficulty in proving damages based upon testimony).  In addition to the risks on the merits, Plaintiffs faced a substantial risk that the Court not certify the state Rule 23 class action and/or the FLSA collective action.

Further, "this is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill." *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 142 F.R.D. 588, 597 (S.D.N.Y. 1992).  There was no governmental investigation or prosecution of this matter.  *See also In re: Priceline.com*, 2007 U.S. Dist. LEXIS 52538, at *15 (absence of government prosecution

increases the risk of litigation)

### 4)    Quality Of The Representation.

Class Counsel have extensive experience representing workers in wage-hour class actions and civil rights actions.  *See Kirschenbaum Decl.* ¶¶19, 22-41. *See, e.g., Williams v. Twenty Ones, Inc.*, No. 07Civ.3978(LAP), 2008 WL 2690734 (S.D.N.Y. June 30, 2008) (conditionally certifying FLSA collective action of restaurant/club workers); *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317 (S.D.N.Y. Oct 05, 2007) (conditionally certifying FLSA collective action of restaurant workers).[30]

Class Counsel used their experience to obtain an excellent result for the class.   *In re Priceline.com*, 2007 U.S. Dist. LEXIS 52538, at *15 ("The quality of representation here is demonstrated, in part, by the result achieved by the class.")  This is confirmed by the enormously positive response to the settlement.  *In re Telik*, 576 F. Supp. 2d at 593 ("The overwhelmingly positive reaction of the Class to the Settlement further demonstrates that Plaintiffs' Counsel have generated an excellent result.")  Indeed, no class member objected to the attorney's fees nor any other part of the settlement, a "reaction . . . [which] is entitled to great weight by the Court." *Maley*, 186 F. Supp. 2d at 374  (where the notice clearly set forth that class counsel would seek 33 1/3 % and there was no objection by the class, it is a testament "to the approval of the Class with respect to the Settlement and the fee and expense application.")

"The quality of opposing counsel is also important in evaluating the quality of Class Counsels' work." *In re Global Crossing*, 225 F.R.D. at 467 (internal quotation omitted). Defendants are represented by Carolyn D. Richmond, an experienced employment litigator and an expert in wage and hour and tip-pooling law.[31] Ms. Richmond is currently Co-Chair of Fox

---

[30] *See also, e.g. Coultrip v. Pfizer, Inc.*, No. 06cv09952(AKH) (S.D.N.Y. July 31, 2008) (summary order granting plaintiffs' motion to certify a collective action pursuant to the FLSA); *Schaefer-Larose v. Eli Lilly & Co.*, No. 1:07-cv-01133-SEB-TAB (S.D.Ind. Feb. 22, 2008) *modified by* No. 1:07-cv-01133-SEB-TAB (S.D.Ind. Apr. 7, 2008) (granting plaintiff's motion for conditional collective action certification and notice to putative class members); *Ruggeri v. Boehringer Ingelheim Pharms., Inc.*, No. 3:06cv1985(JBA), 2008 U.S. Dist. LEXIS 92659 (D. Conn. Nov. 13, 2008) (granting partial summary judgment to Plaintiffs and denying partial summary judgment to Defendants in an FLSA collective action).

[31] http://www.foxrothschild.com/Attorneys/Attorney.aspx?id=4224.

Rothchild LLP's Hospitality Practice Group and previously served as the National Co-Chair of Seyfarth Shaw's Restaurant Employment Practices group.

**5)      The Fee Is Reasonable In Relation To The Settlement.**

A fee equal to "one-third of the common fund after deduction of legal costs … is consistent with the norms of class litigation in this circuit." *See Gilliam*, 2008 U.S. Dist. LEXIS 23016, at *15 (wage and hour settlement). While this percentage could constitute a "windfall" in cases involving larger settlement funds, the $2.5 million fund in this case "does not create such as issue." *Taft,* 2007 U.S. Dist. LEXIS 9144, at *32 (S.D.N.Y. Jan. 31, 2007); *see also, In re Greenwich Pharmaceutical Sec. Litig.*, No. 92-3071, 1995 U.S. Dist. LEXIS 5717, at *19 (E.D. Pa. Apr. 27, 1995), ("a fee award of 33 percent [of $4.3 million settlement] does not present the danger of providing plaintiffs' counsel with the windfall that would accompany a "megafund" of, for example, $ 100 million.").

**6)      Public Policy Considerations.**

Both the FLSA and the NYLL are remedial statutes designed to protect employees from unfair labor practices. *See* 29 U.S.C. § 202(a); New York Labor Law § 650. A fair attorney fee award (which takes into account the services provided and the risks undertaken) furthers these remedial purposes. *Maley,* 186 F. Supp. 2d at 374 ("Private attorneys should be encouraged to take the risks required to represent those who would not otherwise be protected from socially undesirable activities . . .") *Cf. Hicks*, 2005 U.S. Dist. LEXIS 24890, at *26 (recognizing that class actions brought pursuant to the securities law "further[s] objectives of the federal securities laws . . . ").

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that the Court (1) grant granting final approval of a class action settlement, (2) certify the settlement class, (3) award Class Counsel's attorneys fees, and (4)  approve the enhancement awards requested.

Respectfully submitted,

Dated: New York, New York          JOSEPH & HERZFELD LLP
        January 30, 2009

/s/ D. Maimon Kirschenbaum
D. Maimon Kirschenbaum (DK-2338)
Charles E. Joseph (CJ-9442)
Michael D. Palmer (MP-5090)
757 Third Avenue, 25th Floor
New York, NY 10017
Tel: (212) 688-5640
Fax: (212) 688-2548

LAW OFFICES OF JEFFREY E. GOLDMAN
Jeffrey E. Goldman (JG-4693)
501 Fifth Avenue, Suite 1900
New York, New York 10017
Telephone:  (212) 983-8999
Facsimile: (215) 732-2496

*Attorneys for Settlement Class*